## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| W.A. MONCRIEF, Jr.,<br>950 Commerce Street<br>Fort Worth, Texas 76102,<br><br>    Plaintiff,<br><br>  v.<br><br>U.S. DEPARTMENT OF THE INTERIOR,<br>1849 C Street, NW<br>Washington, D.C. 20240;<br><br>JAMIE E. CONNELL,<br>State Director<br>Montana Dakotas Office,<br>Bureau of Land Management<br>5001 Southgate Drive<br>Billings, MT 59101,<br><br>    Defendants. | Case No. _____ |

## COMPLAINT

1. Plaintiff W.A. Moncrief, Jr., by and through its attorneys Crowell & Moring, LLP, respectfully file this Complaint challenging the wrongful cancellation by the U.S. Department of the Interior ("DOI") on January 10, 2017, of Plaintiff's federal oil and gas Lease No. MTM-53320 (hereinafter the "Moncrief Lease") on federal lands in the Lewis and Clark National Forest in the State of Montana.

## <u>INTRODUCTION</u>

2. Plaintiff W.A. Moncrief, Jr. ("Moncrief") brings this action to challenge the DOI's sudden cancellation of a federal oil and gas lease more than 35 years after its issuance by the DOI's Bureau of Land Management ("BLM").  Over three decades have elapsed since the

U.S. Forest Service ("Forest Service") first performed an Environmental Assessment under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, approving the leasing by the BLM of federal lands to Moncrief's predecessor in interest for oil and gas exploration and development purposes.

3.       DOI and BLM recently reversed their long-standing position and voided Moncrief's oil and gas lease on the theory that the Forest Service's environmental review 35 years ago purportedly failed to adequately evaluate the Moncrief Lease's impact on the Blackfeet Tribe's cultural resources and interests in the area.  Instead of giving  Moncrief an opportunity to contest the lease cancellation and protect its property rights, the DOI issued a decision, dated January 6, 2017, through a press release on January 10, 2017 ("Notice of Lease Cancellation"), terminating the Moncrief Lease effective immediately – ten days before the end of the Obama Administration.

4.       The Notice of Lease Cancellation ignores basic facts. There is a prior history of oil and gas drilling and related exploration activities on the actual Moncrief Lease area dating back to the early 1960s.  While the DOI now asserts that the Moncrief Lease is part of a newly defined "traditional cultural district" of the Blackfeet Tribe and should not be developed, the Blackfeet Tribe itself supported oil and gas development in this specific area in the Lewis and Clark National Forest in the 1980s. Further, in 2004, the Forest Service approved of a nearby natural gas pipeline constructed on adjacent National Forest lands which is also within the newly defined "traditional cultural district." Ironically, the Notice of Lease Cancellation emphasizes the importance of stakeholder input in making federal land management decisions, but the DOI failed to provide Moncrief with any advance written notice of the grounds for the DOI's impending decision to terminate the oil and gas lease.

5.      The Mineral Leasing Act ("MLA"), 30 U.S.C. § 181 *et seq.*, does not vest the Interior Secretary with the authority to administratively cancel the Moncrief Lease, and its arrogation of that power to itself violates the plain language of the statute, which only permits the Secretary to administratively cancel a lease if the leaseholder has breached the terms of the lease.  30 U.S.C. § 188(b).  Where, as here, no such determination is made, the Secretary may only seek to terminate a lease pursuant to a judicial proceeding.  *Id.* at § 188(a).  In its haste to cancel the Moncrief Lease, the Secretary also ignored Moncrief's status as a bona fide purchaser. The MLA and its implementing regulations protect bona fide purchasers, like Moncrief, from clouds to title that predate their interest in the property.  30 U.S.C. § 184(h)(2); 43 C.F.R. § 3108.4. In this instance, the statutory protection prevents DOI from cancelling the Moncrief Lease.

6.      DOI's failure to provide Moncrief with written notice and an opportunity to contest the cancellation of the Moncrief Lease violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, which requires agency action to be based on reasoned decision-making, and deprived Moncrief of due process under the Fifth Amendment of the U. S. Constitution.  As a result, DOI relied on an incomplete record which prejudiced Moncrief and resulted in the unilateral and wrongful termination of Moncrief's vested real property interest.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this case arises under the APA, 5 U.S.C. §§ 701-706, and the MLA.

8.      Venue is proper in the U. S. District Court for the District of Columbia under 28 U.S.C. § 1391(e)(1) because, *inter alia*, Defendant The U.S. Interior Department headquarters are located in this judicial district, and the decision to issue the Notice of Lease Cancellation was made by DOI officials located here.

## PARTIES

9.      Plaintiff Moncrief is a sole proprietorship headquartered in Fort Worth, Texas. The company was founded by the late W.A. "Monty" Moncrief in 1929, one of the early oil and gas wildcatters in the State.  In the decades since, it has grown into one of the largest family-owned oil and gas businesses in the United States with operations and employees in Wyoming, Texas, Colorado, New Mexico, Oklahoma, Arkansas, North Dakota, Louisiana, Florida, Mississippi, and the Gulf of Mexico.  Moncrief owned BLM Oil and Gas Lease Number MTM53320 (the "Moncrief Lease") in northwestern Montana on January 6, 2017, when the Deputy Secretary of the Interior wrongfully cancelled the Moncrief Lease without prior written notice and an opportunity for comment, and then publicly issued that termination decision through a press release on January 10, 2017.  Moncrief hereby challenges that decision of the Secretary of the Interior.

10.      Defendant DOI administers the MLA, by and through its employees and its instrumentalities, including the BLM.

11.      Defendant Jamie Connell is the BLM State Director of the Montana Dakotas State Office located in Billings, Montana. Defendant Connell is responsible for administering the MLA in the State of Montana.  Defendant Connell is sued in her official capacity.

## LEGAL FRAMEWORK

### I.      The Mineral Leasing Act

12.      The Congress enacted the MLA to encourage the development of the nation's mineral resources.  *See Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (noting that the purpose of the MLA is "to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise").

13.     To that end, the MLA authorizes the Secretary of the Interior, acting through the

BLM, to issue leases for the development of oil, gas and mineral deposits on federal lands

including in National Forests.  30 U.S.C. § 181; *Mountain States Legal Found. v. Hodel*, 668

F. Supp. 1466, 1469 (D. Wyo. 1987).  A lease issued under the MLA is a real property interest

protected by the Fifth Amendment to the U.S. Constitution.  *See Mobil Oil Expl. & Producing*

*Se., Inc. v. United States*, 530 U.S. 604, 609 (2000); *Lynch v. United States*, 292 U.S. 571, 579

(1934).

14.     An oil and gas lease under the MLA grants the leaseholder and the United States

reciprocal rights and obligations.  A lessee obtains the right to drill for, mine, extract, remove

and dispose of oil and gas on the specified leasehold for a "primary term of 10 years," and

continuing "so long after its primary term as oil or gas is produced in paying quantities."  30

U.S.C. § 226(e).  The United States, in exchange, receives royalties from the lessee of no less

than 12.5 percent "in amount or value of the production removed or sold from the lessee."  *Id.* §

226(b)(1)(A).  The lessee must also pay an annual rental rate prior to drilling a well capable of

production.  *Id.* § 226(d).

## II.     The National Environmental Policy Act

15.     The NEPA statute requires agencies to evaluate the consequences of proposed

federal actions, but it does not impose substantive environmental protection requirements.

NEPA is an "essentially procedural" statute intended to ensure "fully informed and well-

considered decision making."  *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012) (quotation

omitted).  Agencies need only comply with NEPA to "the fullest extent possible."  42 U.S.C.

§ 4332.

16.     An agency must prepare an Environmental Impact Statement ("EIS") if it

proposes to engage in a "major federal action[] significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  To determine whether a proposed

action is a "major federal action" necessitating an EIS, an agency may first perform an

Environmental Assessment, which is an abbreviated but reasonably thorough evaluation of the

need for the proposed project, the alternatives considered and the impacts of those alternatives.

If the proposed action will not have a significant impact on the environment, the agency issues a

"Finding of No Significant Impact ("FONSI"), and the agency need not perform an EIS.  40

C.F.R. §§ 1501.3, 1501.4(c).  An agency need only take a "hard look" at the proposed action's

environmental consequences, but an "agency is not constrained by NEPA from deciding that

other values outweigh the environmental costs."  *Robertson v. Methow Valley Citizens Council,*

490 U.S. 332, 350 (1989).

### III.    National Historic Preservation Act

17.    The purpose of the National Historic Preservation Act ("NHPA") is to

"administer federally owned, administered, or controlled historic property in a spirit of

stewardship" and "provide leadership in the preservation of historic property" while fulfilling the

"social, economic and other requirements of present and future generations."  54 U.S.C.

§ 300101.  To achieve these ends, Section 106 requires an agency to "take into account the effect

of [an] undertaking on any district, site, building structure, or object that is included in or eligible

for inclusion in the National Register" of Historic Places and afford the Advisory Council on

Historic Preservation an opportunity to comment.  54 U.S.C. § 306108.

18.    Like NEPA, the NHPA is a procedural statute that does not dictate substantive

outcomes.  *See Oglala Sioux Tribe v. U.S. Army Corps of Engineers*, 537 F. Supp. 2d 161, 173

(D.D.C. 2008) ("'The case law in this and other circuits holds that an agency's duty to act under

the NHPA is procedural in nature.'" (quoting *Nat'l Trust for Historic Pres. v. Blanck*, 938 F.

Supp. 908, 925 (D.D.C. 1996), *aff'd* 203 F.3d 53 (D.C. Cir. 1999))).  Instead, it only requires that

an agency "stop, look, and listen" before proceeding with agency action. *Illinois Commerce Comm'n v. I.C.C.*, 848 F.2d 1246, 1261 (D.C. Cir. 1988); *see Nat'l Parks Conservation Assoc. v. United States*, 177 F. Supp.3d 1 (D.D.C. 2016) (permitting mineral development on National Grasslands managed by the U.S. Forest Service located with an historic district designated under the NHPA).

## IV.    The Administrative Procedure Act

19.    The APA entitles persons harmed by final agency action to judicial review. 5 U.S.C. §§ 701, 704.  Courts shall set aside agency action that is:

   a.   Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;

   b.   Contrary to constitutional right, power, privilege, or immunity;

   c.    In excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

   d.   Without observance of procedure required by law.

5 U.S.C. § 706(b).

## V.    Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432 § 403 (2006)

20.    On December 20, 2006, Congress passed Public Law 109-432, 120 Stat. 3050, included in the law was a provision withdrawing land in Lewis and Clark National Forest from new mineral leasing, *subject to valid existing rights*. The law also provided tax incentives to encourage owners of mineral interests in the Lewis and Clark National Forest to voluntarily sell their rights to certain non-profit conservation entities which would effectively preclude development.

**FACTUAL BACKGROUND**

21.     Lewis and Clark National Forest has been an area of oil and gas exploration

interest for decades.  The Moncrief Lease itself was once the site of active drilling, approved by

the U.S. Interior Department's U.S. Geological Survey's Conservation Division.  In the early

1960s, the "Kiyo 1-A" well was spud by Phillips Petroleum and drilled without controversy to

11,500 feet, encountering the Bakken Formation at both 2,810 and 4,662 feet.

22.     By the 1970s, the United States was increasingly reliant on foreign oil.  To

combat this increasing dependence, the Congress passed the Energy Security Act in 1980. *See*

President Jimmy Carter, Energy Security Act Remarks on Signing S. 952 (June 30, 1980).  It

provided, among other things, that:

> It is the intent of the Congress that the Secretary of Agriculture shall process
> applications for leases of National Forest System lands and for permits to explore,
> drill, and develop resources on land leased from the Forest Service,
> notwithstanding the current status of any plan being prepared . . . ."

42 U.S.C. § 8855 (1980).

23.     To alleviate a backlog of oil and gas lease applications in the Lewis and Clark

National Forest and to comply with the 1980 Energy Security Act, in 1981 the Forest Service in

consultation with BLM, the U. S. Fish and Wildlife Service, and the U. S. Geological Survey,

prepared a 165-page Environmental Assessment (the "Leasing EA") of oil and gas drilling on

non-wilderness lands in the Lewis and Clark National Forest, including in the Badger-Two

Medicine area, a 129,500 acre tract adjacent to the Blackfeet Indian Reservation which the

Blackfeet ceded to the United States in 1896.

24.     The Forest Service's Leasing EA considered the environmental consequences of

oil and gas leasing in the Lewis and Clark National Forest, with an independent evaluation of six

alternatives. As described by the Forest Service, the alternatives "range[d] from denial of all

lease applications to leasing all lands subject to applications with appropriate stipulations to protect surface resources and land uses." EA at III.

25.     As part of this analysis, the Forest Service analyzed the environment that would be affected should oil and gas leasing commence in the Lewis and Clark National Forest, and in particular, nearby cultural resources.  To that end, the Forest Service "engaged in American Indian Religious Freedom Act compliance with the Blackfeet Tribe during the fall of 1979."  EA at 28.  The Forest Service acknowledged that the Forest "may contain areas of spiritual importance," but stated that "the Blackfeet people prefer to identify these areas on a project-by-project basis." EA at 28.

26.     The Forest Service's alternatives included taking "No Action on Lease Applications at this Time," which "essentially . . . would delay recommendation on leasing until completion" of a Forest Plan.  However, the Forest Service concluded that this alternative, which was functionally equivalent to a "No Action" alternative in that it would result in granting the oil and gas leases at the time, was not compatible with the goals of the then extent Forest Service policy.  Another alternative involved leasing the acreage without permitting surface occupancy, which the Forest Service acknowledged would prevent activities such as oil drilling.  *See* Leasing EA at 31.

27.     Ultimately, however, the Forest Service chose Alternative 3, which granted leases with surface occupancy only for accessible areas that could be protected.  When an area could not be adequately protected, leases would be denied or issued with a no-surface occupancy stipulation.  Moreover, all leases were subject to stipulations enumerated in the Appendix to the Leasing EA, and after lease issuance any proposed oil and gas activities would be fully analyzed under NEPA.  Leasing EA at 61.

28.     The Forest Service issued a Decision Notice and Finding of No Significant Impact on February 18, 1981, approving Alternative 3.  No appeal of the decision was filed.

29.     On June 1, 1982, the BLM issued Federal Lease No. 53320 (subsequently renumbered MTM-53320), *i.e.,* which later became the "Moncrief Lease," for 7,640.00 acres of land in Lewis and Clark National Forest in Glacier County, Montana, to Mr. Randall L. Weeks. The Moncrief Lease is located in the part of the Lewis and Clark National Forest sometimes referred to as the "Badger-Two Medicine" area in northwestern Montana.

30.     Pursuant to the Moncrief Lease, the Lessee has the "exclusive right and privilege to drill for, mine, extract, remove and dispose of all the oil and gas deposits . . . in the lands leased."  Lease Terms, § 1.  The Lease also delineated the royalty amounts to be paid for possessing the lease interest and/or producing oil, *see* Lease Terms, § 2(d), and limited the Government's ability to "dispose" of the leased land's surface or mineral rights to instances when it would not interfere with the lessee's rights under the lease.  Lease Terms, § 3(c).

31.     In exchange for the right to develop the property's oil and gas, the Moncrief Lease provides that the lessee will conduct its operations with due regard for good land management, will obtain the approval of the Area Oil and Gas Supervisor prior to drilling on the property, will subject its plans to environmental analysis, and will "[e]ngage the services of a qualified cultural resource specialist . . . to conduct an intensive inventory for evidence of cultural resources value; submit a report" on such subject, and "implement mitigation measures . . . to preserve or avoid destruction of cultural resource values." Lease at 5-7.  The Lessee also consented to other stipulations limiting its access to certain parts of the subject property and agreed to coordinate with the government to mitigate any impacts on threatened and endangered species.  Lease at 11.

32.     On May 24, 1982, the BLM issued a lease on 6,247 acres of land in the Lewis and Clark National Forest to Mr. Sidney M. Longwell, and Mr. Longwell subsequently assigned that lease to Solenex effective February 1, 2005 (hereinafter "Solenex Lease").  The Solenex Lease is adjacent to the Moncrief Lease.

33.     On December 15, 1982, Mr. Weeks assigned the Moncrief Lease to Atlantic Richfield Company ("ARCO") for $175,000/acre ($1,337,000), and a 5% production payment.

34.     In the early 1980s, the Blackfeet Nation supported oil and gas development in the Lewis and Clark National Forest and the Badger-Two Medicine area in particular.  On December 2, 1983, the Blackfeet Nation adopted Resolution No. 94-84, which expressed support for a joint venture between the Nation and the Forest Oil Corporation of Denver, Colorado, to "explore and to develop hydro carbons in the Ceded Strip Area," which includes the Badger-Two Medicine area.

35.     In 1986, upon the completion and review of an EIS, the Forest Service approved a land and resource management plan for the Lewis and Clark National Forest ("Forest Service Plan"). The Forest Service Plan explicitly concluded that oil and gas development in the Lewis and Clark National Forest was in the public interest and should continue subject to proposed standards and stipulations necessary to mitigate the impact of mineral development on federal lands.  By the Government's own admission (Notice of Cancellation at 4-5.), the EIS "made leasing recommendations similar to those authorized in the 1981 EA and Decision Notice."

36.     Also on April 7, 1986, the Blackfeet Tribe authored a letter to Congressman Pat Williams of Montana objecting to any attempt by the federal government to designate the Badger-Two Medicine area as a "wilderness" under the Wilderness Act of 1964, 16 U.S.C. § 1131 *et seq*.  As the Chairman of the Blackfeet Tribal Business Council explained in his letter,

such designation would conflict with the Blackfeet Tribe's "oil and gas ownership" rights in the Badger-Two Medicine area as well as the rights of "other parties in [the] area with property rights (mineral lessees and grazing permittees)." The Blackfeet Tribal leadership expressed concern that those property owners would "lose their property rights without due process or just compensation," the exact situation unfortunately confronted by Moncrief today.

37.     The 1986 letter from Chairman Earl Old Person of the Blackfeet Nation also described the Badger-Two Medicine area, and objected to its characterization as a "roadless wild area." According to the Tribe, [t]he area is roaded and those roads have been historically used by members of the Blackfeet Tribe. Various logging activities have taken place in this area in the past, as well as grazing activities on large parts of the unit." At no point does the Notice of Cancellation, which refers to the Badger-Two Medicine area as "remote," "relatively pristine," and "wild," ever take into account the Blackfeet Tribe's own views as described in this 1986 letter.

38.     One year later, in 1987, a draft bill authored by U.S. Senator Melcher's office was shared with the Blackfeet Nation so that the Nation could comment. The draft bill provided that the oil and gas deposits in the Badger-Two Medicine area would be subject to the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 181 *et seq.* and further stated that 50% of the revenues from oil and gas leasing would be allocated to the Blackfeet Nation, while 50% would go to the State of Montana. The bill also provided that "all oil and gas leases issued within the Badger-Two Medicine area, and which are in effect on the date of enactment of this Act shall continue in full force and effect." In a letter dated June 23, 1987, by Chairman Earl Old Person to Senator Melcher, the Blackfeet Nation's only comment on this proposal as related to federal

oil and gas leasing and development in the Badger Two-Medicine area was they would "prefer that the bill state that 100 per-centum of the revenues be paid to the Tribe."

39.     Moncrief acquired the Moncrief Lease from ARCO for valuable consideration on January 1, 1989, after BLM had twice conducted environmental analyses and approved of oil and gas development in Lewis and Clark National Forest.

40.     DOI suspended the Moncrief Lease on May 1, 1988. The Moncrief Lease suspension was lifted on January 29, 1993, but on January 30, 1993, DOI immediately reinstated the suspension, which remained in effect though the purported termination of the Moncrief Lease on January 6, 2017.

41.     In 1983, Solenex's predecessor in interest assigned the Lease to a consortium of companies (America Petrofina, Petrofina Delaware, Inc., and AGIP Petroleum Company, Inc., collectively "Fina") for the purpose of drilling on the Solenex Lease. Fina submitted a surface use plan and an Application for Permit to Drill ("APD") an exploratory well on the property. Although BLM and the Forest Service issued a 324-page EA and approved the surface plan and APD, the Interior Board of Land Appeals subsequently vacated the BLM's decision and remanded for additional consideration.

42.     In 1988, after additional years of consideration, the Forest Service combined the analysis of Fina's APD with an APD submitted by Chevron on a nearby lease.  In 1990, upon review of a 982-page EIS evaluating the potential impacts of the APDs, the Forest Service and BLM issued a joint Record of Decision approving Fina's surface plan and APD.

43.     However, the BLM subsequently reconsidered its decision and decided to perform an independent evaluation of the APD's impacts. After concluding its analysis, BLM sought secretarial-level approval of the APD. In early 1993, the Assistant Secretary of the Department

of Interior concurred with BLM's Record of Decision approving Fina's APD. Notably, the Assistant Secretary concluded that the lease was in the public interest and validly issued. While the Assistant Secretary acknowledged that the Blackfeet Nation used the surrounding area for religious purposes, it was unable to identify any "specific potential effects caused by the project to the practice and belief in [the Blackfeet Nation's] traditional religion." 1993 Record of Decision at 15-16.

44.     In 1997, the BLM and Forest Service jointly released the Lewis and Clark National Forest Oil and Gas Environmental Impact Statement. The EIS closed over 350,000 acres of property in Lewis and Clark National Forest to new oil and gas leasing, but it did not terminate the rights of existing oil and gas lease-holders such as Moncrief.

45.     In 2001, the Secretary of DOI withdrew 405,000 acres of land from entry under the Mining Laws, 30 U.S.C. § 22 *et seq.* The withdrawal was subject to valid existing rights, and did not impact the Moncrief Lease.

46.     In June 2003, the Forest Service initiated a process to construct and install a new 12-inch gas pipeline across three miles of the Lewis and Clark National Forest, including about two miles of the National Forest land which was subject to the Solenex Lease. The Forest Service conducted an Environmental Assessment and issued a Finding of No Significant Impact ("FONSI") in 2004, concluding that under the NHPA the pipeline "w[ould] not have an adverse effect on any known or listed or eligible historic places." The Forest Service's 2004 Environmental Assessment found that 70 to 100 feet of the National Forest lands would be completely cleared along the three-mile pipeline length. The Forest Service also consulted with the Blackfeet Tribe, but "identified no properties of traditional cultural interest to the tribe on the pipeline route or temporary construction sites."

47.     Significantly, the pipeline is only one of several existing man-made disturbances located near or within the Moncrief Lease, including a U.S. Highway, Route 2, a portion of the Burlington Northern railroad, an active communications tower, access roads, and another pipeline.  Despite the presence of these other disturbances, the Moncrief Lease now has been singled out by DOI as unacceptably interfering with the Blackfeet Nation's interests in traditional cultural resources associated with these federal lands in the Lewis and Clark National Forest.

48.     On December 20, 2006, Congress withdrew the Badger-Two Medicine area from further oil and gas leasing.  *See* Tax Relief and Health Care Act of 2006, Pub. L. 109-432, § 403, 120 Stat. 3050.  Notably, Congress made the withdrawal subject to valid existing rights, such as the Moncrief Lease. It did not compel the relinquishment of existing oil and gas lease interests as the Notice of Cancellation implied, and in fact provided lessees and others with mineral interests with the *option* to sell their interests in exchange for favorable tax treatment. Moncrief chose to retain the Moncrief Lease.

49.     Around this same time, in 2002, the Keeper of the National Register of Historic Places evaluated whether to list part of the Badger-Two Medicine area as a "traditional cultural district" of the Blackfeet Tribe.

50.     In 2002, it determined that 89,000 acres of the Badger-Two Medicine area was eligible for listing as a traditional cultural district in the National Register of Historic Places. The Forest Service then initiated the NHPA Section 106 consultation process with tribal representatives of the Blackfeet Tribe to determine what impacts Solenex's proposed oil and gas well would have on the area.

51.     After further consultation with the Blackfeet Tribe, the Forest Serviced expanded the boundary of the traditional cultural district in 2014 to include a total of 165,588 acres, which included the three-mile area in the Lewis and Clark National Forest where the Forest Service had approved in 2004 the new 12-inch gas pipeline, which by 2014 had been constructed and installed.

52.     Contemporaneous with that decision, the Forest Service engaged in consultation on the Application for Permit to Drill ("APD") for the Solenex Lease.  In late 2014, the Forest Service issued a determination of adverse effects under the NHPA, concluding that no form of mitigating impacts from drilling on the Solenex Lease could be accommodated with the Blackfeet Tribe's interests.

53.     Despite on-going consultation efforts, the Blackfeet Tribe terminated consultation efforts under Section 106 in July 2015.

54.     Upon review of the Solenex Lease, the Advisory Council on Historic Preservation determined that the newly identified Badger-Two Medicine traditional cultural district is "one of the most cultural and religiously significant areas to the Blackfeet People since time immemorial" and that "no mitigation measures would achieve an acceptable balance between historic preservation concerns and [oil and gas] development."   As a result, it recommended in late 2015 that DOI and the Forest Service cancel the Solenex Lease and "further recommends that the Secretary of the Interior, working with the Secretary of Agriculture, take the steps necessary to terminate the remaining leases . . ." in the newly defined traditional cultural district.

55.     On March 17, 2016, the Interior Department canceled the Solenex Lease in substantial reliance on the Advisory Council's letter.

56.     On November 17, 2016, Donato J. Judice with the BLM called Moncrief and informed the company that BLM may be about to cancel the Moncrief Lease.  Moncrief was provided with no written notice of the purported basis for the potential lease cancellation.

57.     On December 15, 2016, Harry Barnes, Chairman of the Blackfeet Tribal Business Council, authored a letter to Moncrief stating the Tribe's opposition to the development of oil and gas resources on the Moncrief Lease property.  However, the Tribe's letter stated that it remained open to oil and gas development *on the Tribe's property*, which is directly adjacent to the Badger Two-Medicine area, and indeed offered to help Moncrief to obtain "an alternative site to explore and to drill for oil and gas reserves on the Blackfeet Reservation" itself.

58.     On January 6, 2017, DOI apparently signed a letter decision to Moncrief administratively cancelling the Moncrief Lease, although it was not publicly issued until January 10, 2017, when DOI issued a press release on the subject. The Notice of Cancellation relied heavily on the Advisory Council's determination that the Badger-Two Medicine area could not be developed without purportedly harming the Blackfeet Nation's interest in the land.  The Notice of Cancellation nowhere addresses the Blackfeet Nation's history of promoting oil and gas development on these same National Forest lands.  The letter decision was signed by Jamie E. Connell, State Director of the Montana Dakotas Office for the BLM, and by Michael L. Connor, the Deputy Secretary of the Department of the Interior.

59.     On March 17, 2017, Moncrief submitted a Petition for Reconsideration of the Moncrief Federal Oil and Gas Lease Termination to the new U.S. Secretary of the Interior, Ryan Zinke, and this petition was received by the Secretary's office on March 20, 2017.  No further action has been taken to the present date regarding this matter by Interior Secretary Zinke.

## CLAIMS FOR RELIEF

### Claim I: The Secretary Lacked the Authority to Administratively Cancel the Moncrief Lease

60.     Moncrief re-alleges and incorporates by references the allegations of the preceding paragraphs.

61.     An agency may only act pursuant to authority delegated to it by Congress. *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

62.     The MLA enumerates specified limited grounds upon which the Secretary of the Interior may administratively cancel an oil and gas lease.  The Secretary may only cancel a lease absent a judicial proceeding if after 30 days' notice, a lessee breaches the terms of the lease and the lease does not contain a well capable of commercial production or the lease is committed to an approved cooperative or unit plan or communitization agreement . . . which contains a well capable of production. . . ."  30 U.S.C. § 188(b). Otherwise, the Secretary of the Interior may only cancel a lease through a judicial proceeding.  *See* 30 U.S.C. § 188(a) ("any lease issued under the provisions of this chapter may be forfeited and canceled by an appropriate proceeding in the United States district court for the district in which the property, or some part thereof, is located").

63.     Moncrief has never violated the terms of the Moncrief Lease, nor is there any allegation by DOI of a violation by the lessee in the Notice of Cancellation.

64.     DOI did not institute a judicial proceeding pursuant to 30 U.S.C. § 188(a) prior to cancelling the Moncrief Lease.

65.     To the extent the Secretary of the Interior may have relied on 43 C.F.R. § 3108.3(d) for its authority to cancel the Moncrief Lease administratively, that provision provides no authority to cancel an oil and gas lease by administrative action in these

circumstances.  As such, the Secretary exceeded its statutory authority, and its cancellation of the Lease was unlawful.

### Claim II:  The Notice of Cancellation is Unlawful Because it Fails to Account for Moncrief's Bona Fide Purchaser Protections

66.     Moncrief re-alleges and incorporates by references the allegations of the preceding paragraphs.

67.     Even if the Secretary retains that authority to administratively cancel a lease, which Moncrief disputes, the Secretary nonetheless failed to abide by the MLA and its implementing regulations, which preclude the Secretary from cancelling the lease of a bona fide purchaser.  30 U.S.C. § 184(h)(2); 43 C.F.R. § 3108.4.

68.     A bona fide purchaser is one who obtains an interest in property in good faith and for valuable consideration without any awareness of any alleged deficiency in the grantor's title.

69.     Moncrief obtained its interest in the Moncrief Lease from ARCO paying valuable consideration on January 1, 1989.  Prior to that point, BLM had twice conducted environmental analyses under NEPA and concluded that leasing of property in the Lewis and Clark National Forest was permissible.  Moncrief had no awareness, at the time it acquired the Moncrief Lease in 1989, of the deficiency which the DOI now relies upon.  Indeed, the Government did not decide that such deficiency existed until 2017, almost 35 years after it leased the subject property.  From 1989 to January 2017, Moncrief has placed substantial reliance on DOI's issuance of the Moncrief Lease and has conducted geological assessments of the leasehold area and evaluated oil and gas exploration plans to develop the area.

70.     The fact that the Moncrief Lease was suspended administratively at the time Moncrief obtained an interest in the subject property does not deprive Moncrief of bona fide purchaser protection. The lease suspension did not impact Moncrief's title to the subject

property, and there is no allegation that there was a cloud on the title when ARCO purchased the subject property.

71.     Because DOI cancelled the Moncrief Lease without affording it bona fide purchaser protection, the Notice of Cancellation was arbitrary, capricious, or otherwise not in accord with the law.  5 U.S.C. § 706(2).

### Claim III: DOI's Cancellation of the Moncrief Lease is Arbitrary and Capricious in Violation of 5 U.S.C. § 706(2)(A)

72.     Moncrief re-alleges and incorporates by reference the allegations of the preceding paragraphs.

73.     DOI's cancellation of the Moncrief Lease (No. MTM-53320) was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law for the following reasons:

    a.   DOI failed to provide any advance written notice to Moncrief of its intent to terminate the Lease;

    b.   DOI and the ACHP decision it relies upon expresses no awareness of the Blackfeet Nation's prior support for oil and gas development in the Badger-Two Medicine area;

    c.   DOI's cancellation of the Moncrief Lease by press release on January 10, 2017, demonstrates that the agency was improperly influenced by political influences to the exclusion of sound historical, scientific, technical, and legal analysis.

    d.   DOI's decision was issued in an irregular manner and precluded standard administrative review procedures by the Interior Board of Land Appeals.

    e.    DOI impermissibly ignored environmental assessments and impact statements issued since 1982 that showed oil and gas leasing, as well as other development, in the Badger-Two Medicine area would not unduly harm the legitimate interests of the Blackfeet Nation.

    f.    DOI ignored the fact that Moncrief spent time and money both purchasing the Lease and assessing the Lease's potential for oil and gas development in reliance on DOI's 1982 determination that oil and gas leasing was permitted in Lewis and Clark National Forest.

Therefore, DOI's decision should be declared to be "unlawful and set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## Claim IV: DOI's Cancellation of the Moncrief Lease Deprived Moncrief of Procedural Due Process

74.    Moncrief realleges and incorporates by reference the allegations of the preceding paragraphs.

75.    The Fifth Amendment of the U.S. Constitution provides that parties must be afforded due process of law prior to being deprive of their property.

76.    An oil and gas lease constitutes a protected real property interest under the Fifth Amendment.

77.    DOI failed to provide Moncrief with any advance written notice of the purported grounds for the lease termination, and failed to provide an opportunity for a hearing.

78.    DOI failed to meaningfully consult with Moncrief about the Moncrief Lease at any time in the last several years.  In November 2016, Moncrief received a brief phone call from a BLM representative stating that the Moncrief Lease was or may be about to be terminated.

Moncrief was not provided with the basis for that impending decision and was unable to meaningfully respond. Moncrief was never provided written notice of the impending lease cancellation.

79.     On January 10, 2017, DOI issued the January 6, 2017 Notice of Cancellation terminating the Moncrief Lease.  Because the decision was made by the Office of the Secretary at DOI, and not merely the BLM, Moncrief is barred from administratively appealing the termination to the Interior Board of Land Appeals under 43 C.F.R. Part 4, leaving the company with little or no ability to supplement the administrative record with pertinent information that DOI failed to consider in making its determination.

80.     DOI's cancellation of the Moncrief Lease without written notice, without an opportunity to respond, and without an opportunity to appeal prejudiced Moncrief and deprived it of the due process to which it is entitled.

## Claim V: DOI's Administrative Action was Time-Barred Under 28 U.S.C. § 2462 and the Doctrine of Laches

81.     Moncrief realleges and incorporates by reference the allegations of the preceding paragraphs.

82.     Under 28 U.S.C. § 2462 the Government must commence any action or proceeding for forfeiture within five years from the date when the claim first accrued.

83.     Similarly, the doctrine of laches "bars relief to those who delay assertion of their claims for an unreasonable time."  *NAACP v. NAACP Legal Def. and Ed. Fund*, 753 F.2d 131, 137 (D.C. Cir. 1985).

84.     The BLM issued the Lease in 1982 on the basis of an EA. Moncrief relied on the BLM's lease issuance in deciding to purchase the Lease in 1989 for valuable consideration. DOI cancelled the Lease in January 2017 on the grounds that the 1981 EA was inadequate.

85.     DOI's attempt to remediate the alleged error in the EA by cancelling the Lease over 30 years later is barred both under 28 U.S.C. § 2462 because the basis for the lease termination occurred significantly more than five years ago, and under the doctrine of laches because the government's decades-long delay was unreasonable and prejudiced Moncrief.

86.     The Moncrief Lease cancellation should therefore be set aside as unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Moncrief respectfully requests that this Court:

a.   declare that cancellation of the Moncrief Lease was unlawful because DOI's decision was in excess of its statutory, inherent, and regulatory authority;

b.   declare that cancellation of the Moncrief Lease was unlawful because Moncrief is entitled to bona fide purchaser protection;

c.   declare that the cancellation of the Moncrief Lease was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or  without observance of procedure required by law;

d.   declare that the cancellation of the Moncrief Lease without written notice to Moncrief or providing Moncrief an opportunity to respond violated the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

e.   declare that the cancellation of the Moncrief Lease was time-barred by 28 U.S.C. § 2462 and the doctrine of laches;

f.   set aside the decision challenged herein and that Defendants be ordered to reinstate the Moncrief Lease;

g.  that Moncrief be awarded costs and attorneys' fees in accordance with the law.

h.  and that Moncrief be awarded such further relief as this Court deems appropriate.


Dated: April 5, 2017                         Respectfully submitted,


                                             /s/ *R. Timothy McCrum*
                                             R. Timothy McCrum (D.C. Bar #389061)
                                             Tyler A. O'Connor (D.C. Bar #1035160)
                                             Crowell & Moring LLP
                                             1001 Pennsylvania Avenue, NW
                                             Washington, D.C. 20004
                                             Tel:  (202) 624-2500
                                             rmccrum@crowell.com
                                             toconnor@crowell.com

                                             *Attorneys for Plaintiff W.A. Moncrief, Jr.*